### In re PHILP'S WILL.

*(Supreme Court, General Term, First Department.  May 13, 1892.)*

WILLS—PROBATE—APPARENT CANCELLATION—BURDEN OF PROOF.

> Where after a person's death a will is found in an unsealed envelope, which had been in his possession up to the time of his death, and it appears that lines have been drawn through his signature, the presumption is that he himself drew the lines, for the purpose of revoking the will, notwithstanding the will may have been so kept as to be accessible to the employes of the deceased, and visitors at his place of business; and if it is offered for probate the burden is on proponent to explain the canceling lines.

Appeal from surrogate's court, New York county.

Petition by Adelia F. Philp to probate an instrument as the last will and testament of James Philp, deceased.  From a decree denying the probate, proponent appeals.  Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and INGRAHAM, JJ.

*E. V. Thornall,* (*Franklin Pierce,* of counsel,) for appellant.  *Sackett & Lang,* (*G. Sackett,* of counsel,) for respondent.

O'BRIEN, J.  From the decree of the surrogate refusing to admit to probate a writing alleged to be the will of James Philp, on the ground that the same had been canceled during the lifetime of the decedent, this appeal is taken.  Upon the trial, evidence was given of the due execution of the writing by the decedent at the time of its date (August 4, 1887) in the city of New York, and that he was at the time, in all respects, competent to execute a will, and that said paper was after its execution delivered to him, and that on the following day he departed from the city of New York, and was absent in Europe, returning to the United States on the 11th of October, 1887.  After his death, in April, 1891, the alleged will was presented for probate; and it then appeared that the signature of the decedent thereto had drawn through it three lines in black ink, and upon the envelope containing the paper was indorsed, in the handwriting of the decedent, "Will of James Philp, August, 1887," and on the paper itself, the words, "Was made before intended trip to Europe."

The material facts as to the custody of the will are embodied in the fifth and sixth findings of the proponent's request to find, as follows:  *Fifth.* "That, at the time of the execution of said will by James Philp, the attorney who prepared said will, after its execution, delivered the same to the said Philp, and the said Philp inclosed the same in an unsealed envelope, and deposited it in an iron box or safe in his store, situate on Broadway, between Fifty-First and Fifty-Second streets, in New York city; that upon August 5, 1887, the said Philp departed from New York city for Europe, and did not return

to the United States till October 17, 1887. That said box, in which said will was deposited, had no appliance for locking the same, and was in fact unlocked during all of said period, and was used as a money drawer, and the said store was during all of said period in the custody and control of the employes of the said Philp; that after the return of said Philp from Europe the said will was left in said iron box in said unsealed envelope, and said box was unlocked, and for a considerable part of the time the door of said box was left open, down till October, 1889, when the contents of said box, including said will, were removed to a new combination lock safe; that, from the time of the execution of said will down till the last-named date, said will was never secured in any manner; and the employes of said Philp had access to said box, and the visitors to said store might have had access thereto; that, after the said will was transferred to said new safe, it continued in said unsealed envelope, and the said safe was left open during business hours, and that frequently the said Philp would leave said safe open for a night or more at a time; that after the execution of said will, and down till the time of his death, the said Philp was a plumber, residing in the state of New Jersey, and doing business as a plumber in New York city; that he was absent from his said store a considerable part of the time; and that after the transfer of said will to said new safe, and down till the time of the death of said Philp, the said will was accessible, when said safe was unlocked, and the said Philp absent from said store, to the employes of said Philp, in said store." "Found R. S. R." *Sixth.* "That after the death of said Philp the said will was found by James Duane Squires, an attorney acting for the proponent, in the unsealed envelope in which it had been placed by the testator, with other papers of the testator in said safe; that said envelope had indorsed upon it the words, 'Will of James Philp,' in the handwriting of said Philp, and the words, 'Was made before intended trip to Europe,' in the handwriting of said Philp, are indorsed upon said will; that at the time said will was found by Mr. Squires the signature of said Philp was canceled in the same manner as when presented upon this hearing, but the signature of said Philp was then, and is now, plainly legible." "Found R. S. R." From these conceded facts the surrogate finds: "*First.* That the testator drew with his own hand the lines through his signature. *Second.* That he did so with the intent and for the purpose of revoking his will."

In the conclusions thus reached upon the conceded facts, it is insisted by the appellant that the learned surrogate erred in applying the rules relating to the burden of proof, and also in assuming that he was justified in indulging in certain presumptions of fact which alone supported these conclusions. In determining whether this contention is right, it is necessary to briefly refer to the views expressed in the opinion of the surrogate as to the principles of law which control him. He therein says: "The general rule to be spelled out of all the cases seems to be that if a will is traced into the testator's possession, and at his death either cannot be found, or is found torn, the presumption is that he destroyed or tore it *animo revocandi.*" In using the word "presumption," it is clear from the context of his opinion that the surrogate did not pretend that it was a presumption of law, or an indisputable presumption, but rather a presumption of fact, which, as stated in *Justice* v. *Lang,* 52 N. Y. 329, "are said to be but mere argument, of which the major premise is not a rule of law, and are to be judged by the common and received tests of the truth of propositions and the validity of arguments." From the conceded facts, as found, the inference or presumption of fact drawn by the surrogate was most natural, considering the time when the will was executed, its place of deposit, the indorsement thereon, and its condition when found and presented for probate. It has long been recognized as the common mode of destroying the validity of an instrument to cancel the signature of the signer thereof by erasing the name, tearing it off, or drawing lines through

it. The statute, moreover, relating to the revocation of wills, (2 Rev. St. p. 64, § 42,) has been construed to permit or authorize the revocation of a will by cancellation. *Lovell* v. *Quitman*, 88 N. Y. 379; *In re Clark*, 1 Tuck. 454.

It is insisted, however, that the presumption equally as strong arises in favor of the view that some one other than the decedent drew the lines through the signature, and that, therefore, proof in addition to that offer should have been presented. Thus, in answer to the view of the learned surrogate that "if the decedent intended to revoke this will the obliteration of his signature, as it now appears, would have been a natural and probable way of effectuating that purpose, whereas if a third person, without decedent's authority or knowledge, had intended to revoke the will, he would have destroyed it physically, and no vestige of it would have been found after decedent's death," the appellant answers that, if the decedent intended to revoke his will, he would naturally have employed some clear, decisive, unequivocal means of so doing, like burning it, destroying it absolutely, or by making a new will, and he would not naturally have attempted it in such an indefinite, uncertain, and equivocal way as drawing lines through his signature. In weighing probabilities, however, we are not driven to that resort for the determination of this appeal, but for the purpose of showing that in weighing such probabilities the learned surrogate was right, and we need only add to what he has so well said one or two more considerations. The making of a will, with most people, is regarded as a private and confidential transaction, and its secrecy guarded by the most jealous care. A change in the testamentary disposition, once made, is rarely given publicity before death. If, therefore, we assume, with the appellant, that the decedent here was imbued with the intelligence ascribed to him, and intended to destroy the testamentary disposition once made, without giving publicity to the fact, good reasons existed why he should have adopted the plan apparently followed in this case. Had the will been torn or physically destroyed, knowledge on the part of many that it had once been executed might have resulted in an action which is allowable for the purpose of establishing its existence and validity. Such an action is expressly permitted under section 1861 of the Code, where a will has been lost or destroyed. Where, however, a will or other paper, after the same has been canceled, is allowed to remain in existence, and is not destroyed, in the absence of evidence of some kind to show that others had an interest in and the opportunity to cancel the instrument, it will furnish the best evidence as to the intention of the maker thereof to destroy its force and effect. As is said in *Collyer* v. *Collyer*, 110 N. Y. 481, 18 N. E. Rep. 110: "There is no direct proof that Mrs. Collyer destroyed her will. But the proof that the will was not found after her death is sufficient proof that she destroyed it *animo revocandi*. When a will previously executed cannot be found after the death of the testator, there is a strong presumption that it was revoked by the testator, and this presumption stands in the place of positive proof. He who seeks to establish a lost or destroyed will assumes the burden of overcoming this presumption by adequate proof. It is not sufficient to show that persons interested to establish intestacy had an opportunity to destroy the will. He must go further, and show by facts and circumstances that the will was actually fraudulently destroyed." This case, regard being had to the difference between the cancellation of the instrument in the manner here claimed, and a will lost or destroyed, together with many other authorities that might be cited, gives support to the position of the surrogate that the presumption is that where the will was in the custody of the decedent, and at the time of his death is found canceled, or cannot be found, it has been so canceled or destroyed for the purpose of revoking the same. We think, therefore, that the *onus* was upon the proponent to explain the canceling lines in the signature. When the will was presented, it was with this infirmity of cancellation upon and a part of it. In the absence, therefore, of any evidence what-

ever from which the inference or presumption could be drawn of improper treatment of the will, the learned surrogate was justified in the conclusions which he drew from the conceded facts; and the decree appealed from should be affirmed, with costs. All concur.