## *In re* FORBES' WILL.

(*Surrogate's Court, Cortland County, Filed July* 31, 1893.)

WILL—REVOCATION.

> When it appears that a will offered for probate was revoked by a second will, the mere fact that the testator destroyed the subsequent will, without more, does not revive the former will, as it is provided by the Revised Statutes that the destruction, cancellation or revocation of such second will shall not revive the first will, unless it appears by the terms of such revocation that it was the intention to revive the first will, or unless, after such destruction, cancelling or revocation, the testator shall duly republish his first will (3 Rev. St. [Birdseye's Ed.] p. 3345, sec. 53).

Probate of will of Charles A. Forbes, deceased.    Denied.

R. T. Wright, for William A. Bean, executor and proponent; Kellogg & Van Hoesen, for contestant; Henry A. Dickinson, special guardian.

EGGLESTON, S.—The alleged will of Charles A. Forbes, deceased, offered for probate in the Surrogate's Court of Cortland County, bears date on the 1st day of September, 1883. Under this will, William A. Bean, the petitioner, was named as executor. The will appears to have been executed in compliance with the statutory requirements sufficient to admit the same to probate. Upon the return to the citation issued, Pauline B. Forbes, the widow of testator, and Annis R. Forbes and Mabel Forbes, daughters, by their special guardian, interposed objections to the probate of the will upon the following grounds: First. Incompetency of testator to make a will. Second. The will offered for probate is not the last will and testament of Charles A. Forbes. Third. The same was procured to be made by fraud and undue influence. Fourth. That the writing offered for probate was duly revoked by the said Charles A. Forbes in his lifetime, in manner and form prescribed by the statutes of the State for the revocation of such instruments, and that the

writing was revoked by the due execution and publication of a subsequent will, in manner and form prescribed by law, and by destroying the said alleged last will and testament in the manner and form prescribed by law, for the purpose and with the intent of revoking the same.    Upon the hearing, the only ground urged against the probate of the will, based upon the objections filed, was that of the testator having made a will subsequent to the one which is offered for probate, and in and by which later will the will of September 1, 1883, was duly revoked.

The facts, as stated in the record of the case, present a strange state of circumstances, and should be carefully considered in order to arrive at a just conclusion as to whether the will offered for probate has been revoked, and whether it is the last will and testament of the deceased.    Upon the question as to whether or not there was a subsequent will made revoking the will sought to be probated, Mrs. Sophia Bean, who resided in Homer, and was an aunt of the testator, testifies that, upon an occasion when she was in Cortland, the testator handed to her a will for safe-keeping, and upon that occasion he told her that he had made two wills, one before this one; that this occurrence was after the death of the testator's father, and when the testator brought the will to her, he came out of some office in Cortland, but whether or not it was the surrogate's office she cannot tell.    She also says that she never saw but the one will which he handed to her, and that she did not read the will, nor know what its contents were, though she had had some talk with him about one clause in the will, the one providing that the wife should be cut off as a legatee in case of her remarrying.    She further testifies that the will was in an envelope at the time, and that she took it home with her, and kept it in a drawer. · She thinks the time was in the fall of the year.    That she kept the will for several years thereafter until it was sent for, when she sent it to Charles, at Cincinnatus, by mail.    The witness further states that before she sent the will to Charles, she gave it to William Bean, who took it to B. T. Wright, an attorney-at-law at Cortland, and, in pursuance of some instructions received from him, she took the will

to Elliot Stone, a justice of the peace in the village of Homer, and procured him to make a copy of the will; that the copy which was made was compared by the witness and the wife of William Bean, and was a correct copy; and that she safely kept the copy until about the time that the will of 1883 was offered for probate, when she took the copy and delivered it to, or procured it to be delivered to, Mr. Wright.   The will was sent for by Charles, and the copy of the same made during a contest over the probate of the will of one Fred Forbes, a brother of Charles, in which contest William A. Bean, the petitioner herein, was executor and proponent, and Charles was contestant, Mr. Wright acting as one of the attorneys for Bean.   By the evidence of Mr. Stone, it appears that he copied the will for Mrs. Bean, and he states he copied it correctly, and that it is a correct copy of the original will and the whole of it; that it is his impression that the original will was in the handwriting of Judge Knox, though he does not distinctly remember.   Mr. Benjamin, an attorney-at-law, residing at Cincinnatus, N. Y., and one of the attorneys for Charles in the contest of the will of his brother, testifies that he received from Mrs. Bean a will of Charles Forbes, and that it was sent in response to a request by letter that he had mailed to Mrs. Bean, and that he gave the will to Charles Forbes either upon the day that he received it or in a day or two.   He further states that he is very sure that the will was in the handwriting of Judge Knox, and that the signature to the same was in the handwriting of Charles. To Mr. Benjamin, Charles stated at the time of receiving the will that he would destroy it, since which time it does not appear that the will has been seen.   There is some slight difference in the evidence of Mrs. Bean and Mr. Benjamin as to the sending and receiving of the will, but it is almost immaterial, and shows that one or the other of the persons is mistaken as to the exact facts of sending the will in question.   That such will was drawn is further substantiated by the evidence of Judge Knox, who testifies that he drew the will of 1883.   He states that he thinks that he drew a will subsequently to the one of 1883 for Mr. Forbes, and finds an entry upon his

cash book under the date of October 1, 1884, as follows: "Received from Charles A. Forbes, for drawing will, etc., $2.00." At that time Judge Knox was the surrogate of Cortland County. The two subscribing witnesses to the alleged will of 1884, Mr. Suggett and Mr. Stone, testified to the fact that they at about that time were witnesses to the execution of the will of Charles A. Forbes, and, while their recollection is somewhat indistinct as to the details of the matter, yet the evidence given by them is sufficient to make it definite and certain that a will was executed by the deceased at that time. It will be borne in mind that the will was drawn by Judge Knox, the then surrogate of the county, and was witnessed by Mr. Suggett, an attorney having a somewhat extensive knowledge of the drawing of wills, and well understanding what was necessary to be done in the proper execution of the same, and also witnessed by Mr. Stone, who was then clerk of the Surrogate's Court, well acquainted with the statutory requirements necessary to insure a valid execution of a will; in fact, all of said persons being well calculated to perform and have performed all of the statutory requirements necessary in the due and valid execution of a will. That such a will was executed is made quite clear by the evidence of Mr. Wright, who says that Mr. Bean brought to him the original will, and he, with Judge Duell, his associate counsel, examined it and advised the making of a copy of it before delivering it over to Charles. It is his impression that it was dated October 1, 1884, was signed by Charles Forbes, also signed by John W. Suggett and F. E. Stone as subscribing witnesses, and was drawn upon a printed blank. Further than that, the copy of the will made by Mr. Stone produced bears date at the same time as of the drawing of the will by Judge Knox, as appears from the entry upon his cash book, and the names of the subscribing witnesses are the same persons as were witnesses to the will of 1884. So, from the evidence in this case, one can but reach the irresistible conclusion that the deceased did on the 1st day of October, 1884, duly make and execute his last will and testament, of which the copy offered in evidence is a correct copy.

In the will of 1884, which is declared to be the last will and testament of Charles A. Forbes, deceased, is a clause revoking all former wills made by the deceased. The custody of the will of 1883, from the time of the making and execution of the same up to the time it was offered for probate, is not satisfactorily accounted for. By the testimony of Mr. Wright, the attorney for the executor, it appears in some way, which is not explained by the evidence, that the will came into his possession. When or how he received it, or by whom it was delivered to him, he does not know. In fact, he did not know that he had it in his possession until, casually looking over other papers, he found the proposed will in an envelope, marked, "Copy Chas. Forbes' will, to keep;" and it was a matter of surprise to him that he should find an original will of Charles Forbes in his possession. He remembered the fact that the copy of a will was left with him, which is the copy that is produced in evidence as a copy of the will of 1884. The finding of the will offered for probate in the office of Mr. Wright is a strange circumstance (I do not speak of this as a criticism in any way), when viewed in the light of other facts appearing from the evidence in this case. A protracted contest was for several years carried on over the will of Fred Forbes, who was a brother of Charles Forbes. In that proceeding Mr. Bean, who was named as executor in the will of Fred Forbes, proposed the will for probate, and objection to the probate was interposed by Charles. That contest has been carried on for several years, and is still in the courts upon appeal. In that contest Mr. Wright was the attorney for the executor and against Charles Forbes. During that controversy and upon the trial, it appearing that a will had been made by Charles in which he had named Mr. Bean as executor, he was told openly in court by his counsel that he had better procure that will and destroy it. It would be a strange fact, indeed, if, after all of the feeling of bitterness naturally engendered between parties in a protracted litigation—and I think this was no exception—Charles should desire to retain Mr. Bean as the executor of his will, and also knowingly permit the will to remain in the keep-

ing and custody of the attorney who had been strenuously opposing him in the contest and hostile to his interests. Another fact which gives support to the revocation of the will of 1883, and possibly to the destruction of the will of 1884, if that question were in the case, is that, at the time the wills of 1883 and 1884 were made, Sarah A. Forbes was the wife of Charles Forbes, and at that time he had only one child, by the name of Annis Forbes. Subsequent to the making of the will of 1884, another child had been born, and, prior to the death of Charles, his wife had died, and he had again married, the name of his present wife being Pauline Forbes, who is one of the contestants in this proceeding. So that the situation of his affairs at the time of his death, especially in respect to the rights of those who were objects of his bounty, was quite different from what it was at the time when he made either of the wills in question. I am satisfied in this case that the deceased made and executed the will of 1884, and that later, when the same was sent for by Mr. Benjamin, it was so sent for at the request of Charles for the purpose of destroying the same. He had been advised by his counsel to destroy it, and stated to them that he would do so. Since the death of the deceased, the will of 1884 has not been found, though the evidence shows that a diligent search has been made to find the will.

Having reached the conclusion that the testator duly made, executed and published his last will and testament on the 1st day of October, 1884, of which will the copy offered in evidence is a true and correct copy, the only remaining question to be determined is, does the will of 1884 revoke the will of 1883? It is distinctly stated in the will of 1884 that all former wills made by the testator are revoked. By statute it is provided as follows: "No will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked or altered otherwise than by some other will in writing, or some other writing of the testator declaring such revocation or alteration, and executed with the same formalities with which the will itself was required to be executed." 3 Rev. St. (Birdseye's Ed.) p. 3343, sec. 42.

We have, then, proof of the execution of a will by the testator

upon the 1st day of September, 1883, and also proof of the making and execution of a subsequent will upon the 1st day of October, 1884, which subsequent will was executed with the prescribed formalities as required by law, declaring in express terms in the instrument itself that all former wills are revoked by the testator. None of the exceptions referred to in the statute appear in this case. The fact that the subsequent will is not found after the death of the testator when proper search has been made for the same does not afford any ground or reason why the former will should be revived, or why it should be admitted to probate. Such a will, so revoked, is completely out of existence, has no life, and is dead to all purposes. It requires a resurrection by republication, executed with all of the solemnity and exactness required by law to first bring it into existence. Then, again, the will, not having been found after the death of the testator, in the light of the attending circumstances, leads me to believe that it was intentionally destroyed by the testator. It has been recently held that, where a will is not found after the death of a person, it is presumptive evidence sufficient to establish *prima facie* that the testator destroyed it *"animo revocandi."* Collyer v. Collyer, 110 N. Y. 481, 18 N. E. Rep. 110; *In re* Marsh, 45 Hun, 107; *In re* Philp's Will (Sup.), 19 N. Y. Supp. 13. The will of 1884 not having been found after the death of the testator, fortified by the fact that the wife, one of the legatees under both wills, had died; that Mabel Forbes, a daughter, was born after 1884, and was not a legatee under either will; that Pauline Forbes, the second wife, was in no way mentioned and provided for in the will—and by the further fact that the person to whom was intrusted the management of his estate after his death was one who had been in controversy with him for a period of years, raises a presumption sufficient to establish *prima facie* that the testator destroyed the will of 1884 purposely, and without any intention of reviving the will of 1883.

We have, then, these facts established from the evidence: The making and the execution of the will in 1883; the making and

execution of a subsequent will in 1884, declaring in that will that all former wills made by the testator were revoked; and the fact, *prima facie,* that the testator restroyed the will made by him in 1884. "If, after the making of any will, the testator shall duly make and execute a second will, the destruction, canceling, or revocation of such second will shall not revive the first will, unless it appears by the terms of such revocation that it was the intention to revive and give effect to his first will, or unless, after such destruction, canceling, or revocation, he shall duly republish his first will." 3 Rev. St. (Birdseye's Ed.) p. 3345, sec, 53. The second will, by its terms, not only does not in any way affirm the first will, but by express words revokes the same. There is no proof showing that since the revocation the testator has in any way republished the will of 1883, and there are the best of reasons shown why he should not desire to revive that will.

It is urged by the counsel for the proponent that the will of 1884 has not been established, for the reason that it has not been shown that at the time of its execution the testator was of sound mind and memory, and competent to execute it. While the subscribing witnesses have not testified directly upon the question of the competency or incompetency of the testator on October 1, 1884, yet I think from the evidence in the case the conclusion can justly be drawn that the testator was at the time competent to make a will. It is quite evident that, at the time of the making of the will of 1884, the scrivener had before him the will of 1883, as the language used in each of the two instruments is quite similar. Again, it does appear by the witnesses that in September, 1883, the testator was competent to make a valid will, and there is nothing showing that there was any change in his condition of mind subsequent to that time up to October 1, 1884. The will of 1884 differs but slightly from the will of 1883. At the time Charles made the last will he came to Cortland and had it drawn; went to the same person to have it drawn who had drawn the former will, and also who was one of the subscribing witnesses; requested Mr. Stone, who was

a subscribing witness to the will of 1883, to be a witness to the second will.   It appears that he had some conversation with his aunt about certain provisions contained in the will, and arranged for her taking and keeping the will in her possession.   His death did not occur until the 15th day of September, 1892, eight years after the making of the will, and in the meantime he had been engaged as a party in a sturdy litigation in the courts. His first wife had died, and he had married again.   From March 15, 1884, up to September 17, 1884, he came into possession of a considerable property from his father's estate, the same being paid to him by the administrators of the estate; and even the fact of his destroying the will of 1884, under the existing circumstances, I do not think argues against the mental capacity of the deceased husband and father.   The proof, so far as it bears upon the question of testamentary capacity of the deceased, shows that he was of sound and disposing mind, competent to make a valid will at the time of making the last will, and would not justify or warrant the finding of mental incapacity at that time.   It seems to me very clear that the will offered for probate was duly revoked by the testator, and that probate of the same must be denied.   As these proceedings have been instituted in good faith by the executor, he is allowed his costs and necessary disbursements of the proceeding, the same to be taxed before the surrogate, and paid out of the estate; and a decree may be entered accordingly.

(Note as to revocation of wills:)

STATUTORY  PROVISIONS.—WHEN  THERE  IS  REVOCATION.— WHEN THERE IS NO REVOCATION.

### STATUTORY PROVISIONS.

The statutory provisions as to revocation of wills are comprised in 2 Rev. St. 64, chap. 6, tit. 1.

Section 42 provides that no will in writing except in the cases hereinafter mentioned, nor any part thereof, shall be revoked or altered otherwise than by some other will in writing, or some other writing of the testator, declaring such revocation or altera-

tion, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by some other person in his presence, by his direction and consent; and when so done by another person, the direction and consent of the testator and the fact of such injury or destruction, shall be proved by at least two witnesses.

Section 43. If after the making of any will, disposing of the whole estate of the testator, such testator shall marry, and have issue of such marriage, born either in his lifetime or after his death, and the wife or the issue of such marriage shall be living at the death of the testator, such will shall be deemed revoked, unless provision shall have been made for such issue by some settlement, or unless such issue shall be provided for in the will, or in such way mentioned therein, as to show an intention not to make such provision; and no other evidence to rebut the presumption of such revocation shall be received.

Section 44. A will executed by an unmarried woman shall be deemed revoked by her subsequent marriage.

Section 45. A bond, agreement, or covenant, made for a valuable consideration, by a testator to convey any property devised or bequeathed in any will, previously made, shall not be deemed a revocation of such previous devise or bequest, either at law or in equity; but such property shall pass by the devise or bequest, subject to the same remedies on such bond, agreement or covenant, for a specific performance or otherwise, against the devisees or legatees, as might be had by law against the heirs of the testator, or his next of kin, if the same had descended to them.

Section 46. A charge or incumbrance upon any real or personal estate, for the purpose of securing the payment of money, or the performance of any covenant, shall not be deemed a revocation of any will relating to the same estate, previously executed, but the devises and legacies therein contained shall pass and take effect, subject to such charge and incumbrance.

Section 47. A conveyance, settlement, deed, or other act of a testator, by which his estate or interest in property previously devised or bequeathed by him shall be altered, but not wholly divested, shall not be deemed a revocation of the devise or bequest of such property; but such devise or bequest shall pass to the devisee or legatee, the actual estate or interest of the testator,

which would otherwise descend to his heirs or pass to his next of kin; unless in the instrument by which such alteration is made, the intention is declared that it shall operate as a revocation of such previous devise or bequest.

Section 48. But if the provisions of the instrument by which such alteration is made are wholly inconsistent with the terms and nature of such provisions, devise or bequest, such instrument shall operate as a revocation thereof, unless such provisions depend on a condition or contingency, and such condition be not performed, or such contingency do not happen.

Section 53. If after the making of any will, the testator shall duly make and execute a second will, the destruction, cancelling, or revocation of such second will shall not revive the first will, unless it appears by the terms of such revocation, that it was his intention to revive and give effect to his first will; or unless, after such destruction, cancelling or revocation, he shall duly republish his first will.

Section 59. The provisions of this title in relation to the revocation of wills, shall apply to all wills made by any testator who shall be living at the expiration of one year from the time (January 1st, 1830) this chapter shall take effect.

Section 70. The provisions of this title shall not be construed to impair the validity of the execution of any will made before this chapter shall take effect, or to affect the construction of any such will.

Section 71. The term "will" as used in this chapter, shall include all codicils as well as wills.

## WHEN THERE IS REVOCATION.

The revocation of a will executed in duplicate will be presumed, although one copy only was proved to have been destroyed by testatrix with the intention of revoking it, it appearing that the other had not been seen any time after its execution in testatrix's possession. (Asinari v. Bangs, 3 Dem. 385.)

If a will was last seen in the possession of decedent, and it cannot be found subsequently after his death, *held,* that it must be presumed that he destroyed it with the intention of revoking it. (Matter of Nichols, 40 Hun, 387.)

Testator made his will in 1883, and a codicil on April 28, 1884. He maintained sexual intercourse with his servant from 1883 (soon after the death of his wife) till his death in May, 1886. After his death, his servant obtained a judgment award-

ing her dower, the jury finding that owing to the relations of the parties they had intermarried some time between 1883 and testator's death. A child of the marriage was born after testator's death. By the codicil testator had left a legacy to his wife, describing her as a former servant of his late wife, and left another legacy to a child born of the relation between them on 29th February, 1884, describing such child as the child of his said servant. *Held,* that as the evidence rendered it impossible to infer a marriage contract earlier than July, 1884, the will and codicil were revoked by the subsequent marriage and birth of issue. (Matter of Gall, 32 St. Rep. 695, 10 Supp. 661; aff'g 31 St. Rep. 954, 9 Supp. 466.)

A will made by a widow is (as she is an unmarried woman within the meaning of 2 Rev. St. 64, sec. 44) revoked by her remarriage. (Matter of Kaufman, 131 N. Y. 620, 30 N. E. 242, 43 St. Rep. 282; aff'g 40 St. Rep. 550, 61 Hun, 331, 16 Supp. 113.)

When the provisions of a codicil are inseparably blended with those of a will upon which part of the codicil is written, the revocation of the latter by cancellation of the signature revokes the will. (Matter of Brookman, 11 Misc. 675, 33 Supp. [67 St. Rep.] 575.)

The same mental condition is required in a testator for a valid destruction as for a valid execution of his will. (Matter of Waldron, 19 Misc. 333, 44 Supp. [77 St. Rep.] 353.)

When the draft of a will revoking all other wills is produced by the attorney who drew it, and the execution of the original of such will is satisfactorily proved, although the original itself was not found after decedent's death, *held,* that probate of a prior will must be refused, as even if the second will were revoked, the first would not, in the absence of the circumstances required by 2 Rev. St. 64, sec. 53, be revived. (Matter of Myers, 28 Misc. 359, 59 Supp. [93 St. Rep.] 908.)

If a will be revoked by "some other writing of the testator declaring such revocation" (2 Rev. St. 64, sec. 42), it is "executed with the same formalities with which the will itself was required by law to be executed" (id.), when the formality required in the making of a will shall be applied to the "other writing" or paper of revocation, so far as the latter, from its nature and character, is susceptible of having the same formalities observed. So held in Matter of Backus, 49 App. Div. 410, 63 Supp. (97 St. Rep.) 544; rev'g 29 Misc. 448, 61 Supp. (95

St. Rep.) 1070. In that case a testator executed a deed con-
veying all his property upon trust for his use and benefit, and
that of his two children, during his life, and after his death
upon trust for his children, and the instrument contained a
clause revoking any previous will executed by him. The deed
was executed in the presence of three subscribing witnesses to
whom the deed was read over previous to their signing, and to
whom grantor stated that the instrument was his "act and deed."
All the formalities as to the execution of a will were complied
with except publication as a will, and it was *held* that the deed
clearly revoked the will, even as to after-acquired property,
within the meaning of the statute.

A decedent executed a deed of lands in favor of his nephew,
and gave the deed to his attorney, asking him to deliver the deed
to his nephew after his (decedent's) death. Decedent subse-
quently executed a will devising the same property to his wife.
*Held,* that as the deed was not to operate till testator's death, it
took effect as a will, and was therefore revoked by the will in
favor of decedent's wife. (Rochester Savings Bank v. Bailey,
34 Misc. 247, 69 Supp. 163.)

## Where There is No Revocation.

A revoked will may be revived without re-execution by the
execution of a codicil thereto. (Matter of Knapp, 51 St. Rep.
517, 23 Supp. 282.)

A testator left all his property to his collateral relatives.
Subsequently he adopted a child. *Held,* that the will was not
thereby revoked. (Matter of Gregory, 15 Misc. 407, 73 St.
Rep. 3, 37 Supp. 925.)

If a child born after the execution of his parent's will is pro-
vided for therein, he cannot claim the benefit of 2 Rev. St. 65,
sec. 49, providing that he shall be entitled to a child's portion
as if his parent had died intestate, even although the provision
made by the will might not be thought by the court to be ade-
quate. (Minot v. Minot, 17 App. Div. 521, 45 Supp. [79 St.
Rep.] 554.)

Decedent, at the time she made her will, was a married woman
living with her husband. She subsequently became a widow
and remarried. *Held,* that her will was not thereby revoked.
(Matter of McLarney, 153 N. Y. 418.)

In Matter of Ackels, 23 Misc. 321, 52 Supp. (86 St. Rep.)
246, it was held that a will originally written on one full sheet

of foolscap paper was not revoked and was entitled to probate, although the sheet had been cut in two—the first part containing the disposing clauses of the will, and the second the testatrix's and witnesses' signatures and attestation clause, no revocation by cancelling in the presence of two witnesses as required by 2 Rev. Stat. 64, sec. 42, being shown, and although testatrix might have disposed of all her property in her lifetime.

Under the second sentence of 2 Rev. St. 64, sec. 53, providing that the only other method of reviving a prior will where it has been revoked by a second, which has been destroyed, shall be by republication of the first will—such republication to be effectual must be in the presence of the attesting witnesses to the first will. (Matter of Stickney, 161 N. Y. 42, 55 N. E. 396.)

A will offered for probate was dated March 6, 1896. It was alleged that it was revoked by a later will executed about May, 1897. Neither the alleged later will nor a copy of it was produced. One of the witnesses testified that he witnessed a will other than that offered for probate, but could not recollect in what year or month, nor what were its contents. The other testified that he drew and witnessed a will in 1897, but could not fix the date other than the year, and could only remember that it contained a revocation clause. *Held,* that the evidence of a later will was too indefinite to authorize a denial of probate to the paper before the court, especially as the latter had been found locked in a drawer of decedent's safe, alone by itself, a day or two after his death. (*In re* Williams' Will, 34 Misc. 748, 70 Supp. [104 St. Rep.] 1055.)